MARÍA RODRÍGUEZ, Plaintiff and Appellee, v. JOSÉ MARÍA APONTE, HERNÁN APONTE, and PUERTO RICO WATER RESOURCES AUTHORITY, Defendants and Appellants the first two.

No. 11307. Argued March 1, 1955.—Decided October 25, 1955.

*Mario Báez García* for appellants.  *E. Alcaraz Casablanca* for appellee.  *Gabriel Guerra Mondragón* and *Antonio M. Bird* for Water Resources Authority.

MR. JUSTICE SIFRE delivered the opinion of the Court.

A young man twenty years of age, son of the plaintiff, on whom the latter depended for support, died by electrocution upon coming in contact with the chain which held one of the chairs used in an amusement device known as "flying chairs"—power-driven—when he mounted it by virtue of an admission ticket he had bought.  The mother filed an action against the owner of the device, his agent and manager, as well as against the Puerto Rico Water Resources Authority, to recover compensation for damages.  The Superior Court, Mayagüez Part, rendered judgment, ordering the first two to pay ten thousand dollars, plus the costs and five hundred dollars for attorney's fees and exonerating the Authority.  The defendants adversely affected by the judgment appealed.

According to the findings of said court, the defendant Hernán Aponte, owner of the device of "flying chairs", represented by his agent and manager, José María Aponte, made a contract with the other defendant, Puerto Rico Water Resources Authority, by which the latter was to furnish the necessary electric current to operate the chairs.  The Authority started furnishing it by taking the electric energy from a distribution line of the Authority, with two-hundred twenty volts, which ended on a light pole, where the meter was placed, the pole standing at a distance of approximately fifty feet from the place where the chairs were installed, to which the current was transmitted through wires enclosed in a rubber insulated cable extended on the ground and which was connected to the distribution line by an employee of the Authority.  However, the electric installation of the "flying chairs" was made by one of the appellants.  The cable running from the main line as well as all the electric equipment

through which the current passed from there to the chairs, belonged to one of the appellants, and was under the control of both appellants. Through that cable and equipment, the chair device received electric energy of 220 volts for the motor, which was an addition to the apparatus, and of 110 volts for lighting purposes.

The whole installation was inspected by one of the employees of the Authority, before the latter started to supply the current and no defect was found, and once the inspection was made and the installation approved, the Authority started to supply electricity, and the "flying chairs"—which were installed in a platform to which the public had access, upon payment of a fare—were operated and continued in operation without obstruction of any sort for four days before the accident. The latter occurred when plaintiff's son, who had bought an admission ticket for a ride in the chairs, grasped the chain from which they hung in order to sit on the chair, receiving "a shock which threw him to the pavement from where he was picked up dead . . .", as expressed by the lower court in its findings, one of which states: "The circumstances surrounding the death . . . allow us to infer that the electric shock which caused his death was received by the deceased when he touched or came in contact with the chain which held the "flying chair" which he intended to use the night of the accident and thus we conclude, as a question of fact, since such inference has not been rebutted or controverted." The chain with which plaintiff's son came in contact, in the opinion of the lower court ". . . should not ordinarily transmit any electric current." After the tragic accident, the Authority again inspected its lines, as well as the appellants' installation, without finding any irregularity in either one.

The lower court decided that the evidence showed that when the death occurred, the "flying chairs" were under the control of the defendants-appellants José María Aponte

and Hernán Aponte, the former as manager of the latter, and the latter as owner of the chairs; that the accident happened through no fault of the deceased, and that since the accident is one "not apt to occur in the normal course of events if said defendants, owner and manager, had exercised proper care in the handling and operation of the device causing the damage, it must be concluded that . . . they were negligent and that their negligence was the direct, proximate, and efficient cause" of the death, "applying the doctrine of *res ipsa loquitur*." It refused to apply the same doctrine to the claim against the Authority for the reasons we shall explain later.

The appellants complain in the first assignment that the doctrine was applied to them and maintain that it may not be invoked when specific acts of negligence are alleged. We have decided the opposite. In *Román v. Mueblería Central*, 72 P.R.R. 320, we decided that "it is not in keeping with the modern tendency of the courts to do substantial justice despite technicalities to the contrary, to refuse to apply the doctrine of *res ipsa loquitur* merely because the plaintiff alleged in his complaint specific acts of negligence which he later attempted but was unable to prove, due precisely to the inexplicable way the accident occurred" adding that "if from the evidence it appears that the doctrine applies and that due to the circumstances under which the accident occurred, the plaintiff cannot really prove the specific acts of negligence which he alleged, the failure to apply the doctrine is clearly unfair." [1]

[1] The plaintiff did not prove that the death was caused, as she alleged, because the defendants Aponte allowed "the extension of high-tension wires in and around their devices and because the Puerto Rico Water Resources Authority had such wires spread through the place and connected to the devices without any warning of danger." When the defendants filed a motion for nonsuit, the plaintiff relied . . . on the doctrine of *res ipsa loquitur*. Under the circumstances in which the accident occurred, it is not venturesome to say that it was not possible for the plaintiff to prove what caused the current to be carried to the chain which held the chair.

■■ Considering the nature of the accident, the doctrine of *res ipsa loquitur* could be applied to the case at bar, as it was with respect to the appellants. Death came to plaintiff's son through no negligence of his own when he lawfully entered the "flying chair" of a device controlled by the defendants Aponte, as the result of an incident which would not have occurred in the normal course of events, had the defendants exercised due care in the handling and operation of said device, there arising the justifiable presumption that it happened through defendant's negligence, which was the immediate and efficient cause of his death, and which presumption was not controverted by any evidence. In *Hermida* v. *Feliciano*, 62 P.R.R. 54, we said that the doctrine of *res ipsa loquitur* is a rule of evidence, that "what it does is to provide that, once the facts warranting its application are established, the plaintiff is relieved from the ordinary rule requiring him to show in the first instance that the defendant was negligent", giving rise instead to "an inference of negligence, as a matter of circumstantial evidence, without any direct proof thereof, . . . and the burden of going forward with the evidence is shifted at that point to the defendant who must show that he exercised due care", which, as we have seen, the appellants did not show.

It would be whimsical indeed to reject the conclusions of the trial court to the effect that the negligence of the appellants should be presumed on the ground of such doctrine and we would commit a serious injustice if, for the reason adduced by appellants, we should decide that it is inapplicable. The principle established in *Román* v. *Mueblería Central, supra*, which must be interpreted in the light of the purpose which is pursued, fully justifies, in our judgment, what we have just stated.

■■ There is no merit in the contention of the appellants to the effect that it may not be presumed that they were negligent in view of the fact that the Authority in-

spected the electric installation of the "flying chairs" before supplying the electric current.[2]

The lower court held that the death had been caused by the electricity furnished by the Authority, but that no negligence on the part of the Authority could be presumed under the doctrine of *res ipsa loquitur*, since said defendant had no control over the "flying chairs" device or over the electric current which passed through the installation of the appellants, "beyond the meter", deciding that the doctrine was not applicable to a company supplying electric energy, for damages caused by private lines, under the control of the owner, when the obligation of the company is limited to supply the current, and when it is not proved that the damage followed as a consequence of an excessive current, which the lower court believed was not established by the evidence. It said to that respect, ". . . there is no evidence that the death was caused by an electric current of high voltage, nor can we presume such a fact, considering the statement of Dr. Perea that the current of 110 volts supplied for the lighting of the 'flying chairs' could cause the death of a human being when in contact with water."

The appellants urge in the second assignment that such conclusion is prejudicial—because the Authority was exonerated from liability—and maintain that the lower court "rested its pronouncement on the mere statement of Dr. Perea, to the effect that the electric current of 110 volts was enough to cause the death of a human being, a statement which does not exclude the possibility that a current of

---

[2] The appellants call our attention to Act No. 42 of April 17, 1935 (Sess. Laws, p. 242), which in § 2, amending § 10 of Act No. 13 of 1923 (Sess. Laws, p. 190), as amended by Act No. 36 of 1932 (Sess. Laws, p. 276), provides in part as follows:

". . . *Provided, further*, That no public-service company shall approve, or furnish electric current to, any electric installations, repairs or work which has not been done by authorized expert electricians." We refer again to that legislation in the discussion of the third assignment in which it is alleged that the lower court erred in dismissing the complaint against the Authority.

higher voltage circulated through the wires causing the death." We do not agree. The trial court decided, correctly in our judgment, *that there was no evidence to the effect that the death had been caused by a high voltage current, and referred to the statement of Dr. Nelson Perea simply to decide that the opposite could not be presumed,* in view of the fact that according to the testimony of said witness, a current of 110 volts—as we have seen, the one furnished for the lighting of the "flying chairs" was of such voltage—"may cause the death of a human being when in contact with water." [3]

It is argued in the third assignment that the lower court erred ". . . in deciding that the Authority . . . is not liable for the death . . . , and that the doctrine of *res ipsa loquitur* is not applicable to said codefendant."

The appellants contend that "where there is legislation requiring that the companies supplying electric service should make inspections or verify the adjustment of the installations before service is given, as in Puerto Rico, there is no doubt that the failure to comply with such requirement or the negligent compliance with them, constitutes negligence on which to base civil suit." Apparently, they refer to the provision copied in footnote 2, in accordance with which, as has been seen, "no public-service company shall approve, or furnish electric current to, any electric installations, repairs or work which has not been done by authorized expert electricians," and to the fact that the installation of the "flying chairs" was made by one of the appellants who was not an expert of that sort, and approved by an employee of the Authority who was no expert either.[4]

---

[3] There was evidence to the effect that the ground in the vicinity of the chairs was wet.

[4] The employee of the Authority who made the inspection, on the basis of which the installation was approved, was an experienced man, with several years of service in similar inspections.

The evidence showed that no defect, either before or after the accident, could be found in the lines of the Authority, or in the electric installation

The Authority attacks the legal provision invoked by the appellants as unconstitutional, maintaining that it refers to expert electricians, a subject not mentioned in the title of Act No. 13 of July 2, 1923, as amended in 1932 and 1935, or in any other of the acts modifying it.[5] It argues moreover that if such provision is valid, and assuming without admitting, that the approval of the electric installation of the "flying chairs" was negligent, no liability could be attributed to the Authority since the "relation of cause and effect between the damage . . . and the assumed negligent act" had not been proved.

There is no need to decide the constitutional question raised, or to go into an argument on the imputation made by the appellants against the Authority to the effect that the latter violated the legal provision that they invoke, since, as the Authority properly contends, no evidence was introduced to show that the fact that it approved an installation which had not been made by an authorized expert, was the direct and efficient cause of the death; in other words, in view of the fact that there was an absolute lack of evidence connecting the alleged violation of the provision with the

of the chairs. They functioned normally for four days before the accident, as we have said, and were used after that, without interruption.

After the accident, the Authority made a new inspection of its lines and of the installation by means of an authorized expert electrician, and no defect was found in them.

[5] When the accident occurred and at the commencement of the suit, the Organic Act of 1917 was in force, § 34 of which, in part, provided that:

". . . No bill except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in its title; but if any subject shall be embraced in any act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed."

Act No. 13 of July 2, 1923, had the following title: "To regulate the operation and handling of Cinematograph Machines, and for other purposes." The title continued thus until it was amended by Act No. 26 of August 29, 1950 (Spec. Sess. Laws, p. 96), to read thus: "An Act to regulate the operation and handling of Cinematographic Machines and the practice of the profession of electrician, and to create a Board of Examiners of Cinematograph Machine Operators and Expert Electricians."

damage, *Maldonado* v. *Hamilton*, 32 P.R.R. 208; *Vélez* v. *Font*, 35 P.R.R. 286; *People* v. *Pereira*, 49 P.R.R. 869; *Miner, Read & Garrette* v. *McNamara et al.*, 72 Atl. 138 (Conn.) ; *Cary* v. *Los Angeles Ry Co.*, 108 Pac. 682 (Cal.) ; *Lindsay et al.* v. *Cecchi*, 80 Atl. 523 (Del.)

In accordance with the contract executed with the owner of the "flying chairs", the electric service given by the Authority was subject to the general terms and conditions established by the latter for those services, including among them that "The Authority shall have the right, but not the obligation, to inspect the electric installation, but the fact of making or failing to make such inspection or rejecting or accepting the installation, shall not make the Authority liable for any loss, damage or accident that might result from any defect in the installation." The appellants argue that the contract "can not defeat the purposes of the prevailing legislation," referring again to the provision copied in footnote 2.

Having reached the conclusion that no causal relation was shown between the approval of the installation by the Authority and the damage caused, it would be useless to discuss the question raised, although it is convenient to say that, in general, a company furnishing electric power may not shield itself behind the clauses of a contract to elude liability *for damages caused by it, as the consequence* of failure to comply with rules established by law, or traditionally known by the jurisprudence, as necessary measures for public safety and protection,

We are fully convinced that it was not proved that the death was a consequence of a specific act of negligence, and likewise that the lower court did not err in deciding that the doctrine of *res ipsa loquitur* is inapplicable to the Authority. The death occurred, we repeat, when plaintiff's son entered one of the "flying chairs" of a device which, like the whole electric equipment used to carry current, was

under the absolute control of the appellants. It is true that the Authority furnished the electric power to the main line, but it had no control over that which caused the death at the place of the accident, "beyond the meter and already circulating through the installation" of the appellants, and it was not proved that the Authority had furnished excessive and dangerous current, or that there existed any causal connection between it and the instrument which caused the damage.[6]

■ In the fourth assignment, it is alleged as error that the court held "that the defendant Hernán Aponte as well as the codefendant José María Aponte, one as principal and the other as his agent and employee, are obliged to indemnify the plaintiff . . ." The assignment lacks merit. There is sufficient evidence in the record to support the conclusion that the two appellants are liable for the damages suffered by the plaintiff.

Considering the analysis we have made of the evidence, it is clear that there is also no merit in appellants' contention —fifth assignment—that the lower court erred in weighing the evidence and granting the complaint as to them. Plaintiff-appellee lends her support to this contention, as well as to others adduced by the appellants in order to maintain that judgment should have been rendered against the Authority.

■ Under the title "Additional Issues", the plaintiff requests the reinstatement of the appeal taken by her from the judgment involved in this suit, and which was dismissed in case number 11,162 of this Court—because the transcript

_____

[6] No negligence can be presumed as the cause of the death, on the part of the Authority, by reason of the fact that it approved the installation as it did, among other reasons, because since it was shown that when the Authority started furnishing electric power the installation was in a condition to receive it, without it being proved that at any time before the accident the Authority had any knowledge of any defect in the installation, which would make it unsafe to continue furnishing the power, there is no basis for such a presumption.

of the evidence was not filed—on motion of the Authority by order of January 8, 1954, and ratified on the 28th of said month and year, when a motion for reconsideration was denied, and once reinstated, she prays that we render the judgment which, in her opinion, should have been rendered by the lower court, granting the complaint as to all the defendants, increasing at the same time the amount of compensation and of attorney's fees. We can not consent to such pretensions.

The judgment appealed from will be affirmed.